2016 20766 Joseph Cotropia v. Mary Chapman et al. You may proceed with argument. If it pleases the court, my name is Tommy Swaik and it's my high honor and privilege to be here to represent Dr. Joseph Cotropia. In 1791, it was clearly established that petty government officials could not invade the privacy of residents of the United States. It was a clearly established law by the Fourth Amendment. The Texas Medical Board apparently hasn't got the message. On March 27, 2015, Mrs. Chapman, the first Mrs. Mary Chapman, an investigator for the Texas Medical Board, arrived at 779 Normandy Street, the closed office of Dr. Joseph Cotropia. Dr. Cotropia's office had been closed for two weeks. Let me ask one question. I hope I've got the facts straight here. It's up to you to straighten me out. The doctor lost his medical license. Is that right? That's correct. Was that before this happened or after? It was before this happened. Okay. On 3-27-15, which is the day you're talking about, he had already lost his medical license. Yes, yes, Judge King. In fact ... Therefore, he wasn't ... In theory, anyway, he wasn't conducting a medical business in that place. No, ma'am. No, ma'am. He was maintaining his patient's medical records? He was maintaining files and his office equipment in that place. So it was to keep the patient's records until they could be distributed or whatever to their new doctors and that sort of thing? Yes, Judge O'Rourke. Okay. Are you ... Go ahead. I'm sorry. Since you're on the subject of the loss of license, was that an irrevocable revocation of his license or was it a suspension? What was the status of the license? Well, he had lost his license. It wasn't a suspension. In fact, on that very day, the Texas Medical Board knew he wasn't going to be in the office. Why? Because he was on his way to Austin for a temporary restraining order hearing or asking for one. So they knew he wasn't there. So they went over to get the ... So they went there anyway. Counsel, in your amended complaint, you requested an injunction preventing them from conducting warrantless searches and seizures. Are you still seeking an injunctive relief against the board and or its members through Ex Parte Young or are you not seeking that? We're not seeking an injunction, Your Honor. What we're seeking is damages against Ms. Chapman in her individual capacity. Damages only against this one person. You're not seeking relief against the board at this time? We're seeking a declaratory judgment that the board has a pattern of violating the constitutional rights of their licensees. They have this pattern of deliberately. This is deliberate. This is not unintentional or some accident. They do this deliberately. Mrs. Chapman came into this office, said, would not allow Mrs. Spa to leave until you give us the two records that she had in her administrative subpoena. She had filled out an administrative subpoena that day. Right. She's treating an administrative subpoena like a warrant instead of like a subpoena to which you get to respond and object and do all of that. That's your position, right? Yes. But it's worse than that. It's worse. It's a worse situation than that. They don't even have an administrative subpoena for the records they took. Mrs. Chapman comes in, holds Ms. Spa hostage, will not let her leave the office, threatening her with arrest if she doesn't give over two records. In the meantime, Mrs. Chapman rummages through the papers on Mrs. Spa's desk. She took records that were not handed to her by the – she just took records. No, ma'am. Right? They weren't – isn't that right? Yes. These records were not under protest. They weren't produced. No. She just took them. No. Under – Is that correct? That's correct. Okay. And they're not responsive documents to the administrative subpoena, is your position. Not only were they just taken, but they're not responsive. That's correct. Okay. I think we got it. That's – that's our position. It's incredible that Mrs. Spa called her attorney and asked – the administrative subpoena was directed to Dr. Katropia or the custodian of records for Dr. Katropia. Mrs. Spa tells Mrs. Chapman, I'm not the custodian of records, but however, let me call my lawyer. She calls her lawyer. Lawyer tells her, not only are you not the custodian of records, but tell those people to get out of that office, which Ms. Chapman refused. Then during this period of time, Ms. Chapman rummages through the papers on Mrs. Spa's desk, takes certain documents and plugs in her copying machine and copies them, and the documents are not even responsive to the administrative subpoena. Now, if the administrative subpoena had been valid and Mrs. Spa objected to producing the documents, then one or the other parties has the right to go get a compliance – a precompliance hearing before a neutral magistrate or judge and then decide on whether the administrative subpoena can be enforced. Mrs. Chapman cannot enforce the administrative subpoena in the field. You said – I maybe misunderstood you, but I think you said they were looking for two things. Two things? You said the number two. No, the administrative subpoena had the names of two patients. They wanted the patient files for two patients. Oh, so these were – this was not we're coming and looking at every single sheet of paper in this office. We're looking for the files for two patients? Two patients. For two patients. Two named patients. But – so the administrative subpoena only says two named patients? That's correct. And where is that in the record again? Do you know? Ma'am? Where is that in the record again? It should – it – Maybe it's readily, and I – It would be the subpoena itself. Okay. And so it's just for two named patients, and the documents that were on the desk are not about those two patients? No, ma'am. But even if they were on the desk, Mrs. Chapman didn't have a right to take those documents without a pre-compliance hearing if there's an objection to taking the documents. That's well-settled law. Well-settled law. Let me ask you something. Are you familiar with the procedures that this group uses? Do they have a regular pre-compliance hearing mechanism under the rules here? No, ma'am. In fact, well – Who's supposed to conduct this hearing? Well, one party or the other would have to ask a district judge for relief. If the – Dr. Tropia was fighting the subpoena, he filed a motion for protection in a district court, and there would be a hearing about whether the – To take this report? Yes. Yes, Your Honor. The – it's just incredible. Well, this – I mean, I guess we'll have to save this question for the state, but I – I mean, this isn't their first rodeo. I mean, they must have come in and asked for – they must have used this procedure on other – Judge, in my 28-J letter that I sent to court, Judge Rosenthal ruled on a similar situation. They have a pattern of doing this. They have a pattern of violating the constitutional rights of their licenses. Judge Rosenthal faced a case in Houston, similar situation, that go into Dr. Berry's office, tell them they want all the records without a subpoena, tell the administrator, if you don't give us the records, we're going to have you arrested. Go through all the records and then fill out a subpoena for the records that they wanted. And Judge Rosenthal ruled totally opposite to Judge Ellison's ruling in this case. And it's almost a similar fact situation, but they have a history in Texas of doing this. This is not the first rodeo that Mrs. Chapman's been in. And Mrs. Chapman's usually involved in these constitutional violations. But the – Judge Ellison did not undertake the two-prong analysis required for qualified immunity. He granted qualified immunity to Mrs. Chapman. He did not undertake to determine whether there was a constitutional violation, which there is obvious constitutional violation, and did not undertake to determine whether this constitutional violation was reasonably known to an investigator, any government official such as Mrs. Chapman. Instead, he undertook an analysis that, well, there wasn't any penalty. It is all right to take the papers, and if you don't arrest the doctor or fine the doctor or penalize the doctor in some way or the people who are refusing to give the documents, there's no damages. That is not the United – this is the United States of America. Petty government officials do not get to go into an office and rummage through records at their – whatever they want, do whatever they want, hold people hostage until they give the records over. And it's clearly established law according to C v. Seattle, so there's no qualified immunity issue. Second position. Donovan v. Lone Star, Inc., and I'm quoting from Judge Rosenthal's order, 464 U.S. 408.415. The opportunity for a pre-compliance review has long been a requirement of administrative searches. That's a quote from certainly a lawyer who's more qualified than I ever thought about being Judge Rosenthal. And that's the answer to that. This is clearly established. And what relief do you seek from us today? The court reversed the decision that Mrs. Chapman has qualified immunity, send the case back to the court for proceedings consistent with the law, the constitutional damages from Mrs. Chapman, a finding, a declaratory judgment that the Texas Medical Board has a pattern of unconstitutional searches. That's the relief we're seeking. But we're not going to make any – we're just sending it back to the district court. Right. You'd send it back to the court. If you prevail. Do you have anything else, sir? I just want to make – you're asking for relief against the board. Is that right? You said you want a determination that they've engaged in a pattern. A pattern of – two reliefs I'm asking. One, damages against Mrs. Chapman as an individual, and then a declaratory judgment that the Texas Medical Board is engaged in a pattern of unconstitutional behavior. And their searches. And the facts in support of the allegation that they've engaged in a pattern are? Well, Judge Rosenthal's order for one. Well, that's her finding in another case. Right, but it's similar. But you're saying she found that they engaged in a pattern, and you're asking us to adopt her – the finding of the district court. No, no, no. All I'm asking today here is that the finding of qualified immunity from Mrs. Chapman be reversed and the case sent back to the district court for proceedings consistent with what – So you're not asking for us to make any findings or determinations about patterns or practices today? No, no, no, Your Honor. I'm asking just that the judge, Judge Ellison, the only finding he had was that she was entitled to qualified immunity because he admitted she violated Dr. Petroffi's constitutional rights, but it just didn't damage him in the sense of a tort damage. He wasn't physically abused emotionally, wasn't in any great damages. But that's not the test of damages for a constitutional violation. And do we have to take the facts as you've alleged them at this point? If she says, oh, I didn't actually take the wrong documents or pick them up, we're not dealing with that. We take them as fled right now. They admit in their brief – the Texas Medical Board admits in their brief that she took the documents against the protestations of Ms. Fogg, and they admit what documents they took,  They never claim, well, I had an administrative subpoena that listed these documents. They didn't claim that at all. So the – but we're asking that the judge's decision regarding Mrs. Chapman's qualified immunity be reversed and the case sent back to the district court for further proceedings. Thank you, counsel. You've saved time for rebuttal. Can I reserve five minutes for rebuttal? Yes, sir. Yes, sir. My police and court, my name is Eric Hudson. I represent Mary Chapman, who's here with me today at council table, as well as the Texas Medical Board defendants. There are several claims here, both involving the Texas Medical Board and Mrs. Chapman. As we stated in our brief, we believe that all of the arguments against the Texas Medical Board have been waived at this point. Given that we believe they've been waived, I'm going to focus my argument this morning on the qualified immunity piece. Can you quickly address why they're waived? Well, the short version is Mr. Swate didn't raise any of the claims against the Texas Medical Board in his opening brief. It wasn't until after we raised the fact that they were not briefed or argued in the opening brief that he then, in the reply brief, came back and decided to more fulsomely explain why it was he believed that the Texas Medical Board claims survived, despite not having raised any real issues with them or pressing any arguments for them in his opening brief. Further, we would also point out that there was a failure to actually adequately cite to the record as to any facts or any arguments in support of his claims against the Texas Medical Board. Therefore, we think it would be appropriate for this court to find that all of the claims against the Texas Medical Board, to the extent that he raised them solely in his reply brief, should now be found to be waived, and this court should not address those issues. Now, as to the qualified immunity issue as it relates to Mrs. Chapman, the issue before the district court was whether there was an administrative search exception applicable to the administrative subpoena that Mary Chapman brought to purportedly Dr. Petropia's office in the March visit. Now, the issue in this case is whether the administrative search exception to the Fourth Amendment applies. That was the issue that was not clearly established as a matter of law before Judge Ellison. Now, it's our position that the administrative searches that the Texas Medical Board conducts are in fact constitutional, but this court need not reach that issue in this case. The simple fact is that there is nothing in the record that indicates that the administrative subpoena that Mary Chapman delivered as part of an inspection of Dr. Petropia's office somehow fell outside the scope of the administrative search exception to the Fourth Amendment. They do this other times because we've had a case where they've done this in the past year about where it was pharmaceutical records of patients. Isn't that correct? That is correct, Your Honor, and there are actually two other cases that are currently pending before this court where the administrative search process and the inspection process from the Texas Medical Board are actually more fulsomely briefed and, in my opinion, would be better vehicles for this court to look at if it actually wanted to write on the question of whether there is some deficiency in the Texas Medical Board's administrative searches. So it's not like they're saying she made a mistake. In fact, your brief is pretty much she did the right thing. The Texas Medical Board believes they can go in with administrative subpoena and just seize things. Is that correct? We believe that standard subpoenas are part of a constitutional administrative search. Does that mean they can just go and take the document, the administrative subpoena, and just go that very day and seize things even if the correct person protests? Well, it would be a different question if the correct person protested. We don't believe that Ms. Farr was the correct person. Okay, I'm asking if the correct person, assuming arguendo, the correct person protests, does the Texas Medical Board take the position that it can seize documents pursuant to an administrative subpoena on site without the opportunity for a hearing before a neutral magistrate or district court? No, we're not taking that position in this case, Your Honor. It's our position rather that what happened here was that a standard subpoena was delivered as Counsel for Dr. Petropia pointed out. The office was locked. That's part of the briefing. Ms. Chapman was actually permitted into the otherwise closed facility to come and deliver the standard subpoena, and there were records that were available at the front desk in the public area of the office after she was permitted in the facility. Was she told that she could take those documents by anyone in authority who had permission, who had authority to say that she could take those documents? No, Your Honor. She just confiscated them. I wouldn't characterize it as a confiscation. What would you characterize it as? Well, I would characterize it as part of the administrative inspection that Mrs. Chapman was conducting on the day that she went to Dr. Petropia's office. But no one in authority gave her those documents or gave her permission to view them. Well, we can... Is that correct? So it might help. So I believe that point is in contest, but because we're stuck with the pleadings as they exist in the district court, the answer to that question right now is no for purposes of this appeal. I understand. And so what I would say is that Ms. Spall has already litigated a case against Ms. Chapman for the very same events giving rise to the very same arguments before a different judge, Judge Gilmour, in the district court. This case was actually filed a year after that litigation ensued. We contest that there was no authority given to Ms. Chapman to actually take and copy the records at the time. But, of course, we are capping to the pleadings as they existed in front of Judge Ellison. But further, you don't agree that that authority was even necessary, do you? You seem to be saying that the issuance of an administrative subpoena equals the issuance of a judicial warrant for a search. In other words, with a judicial warrant, there is all wrapped up in that the authority to conduct the search. But with an administrative subpoena, that allows that you can put someone on notice that these are some documents or records or whatever it is that you want to inspect, review, examine. You seem to be saying that authorizes the seizure of the documents, that administrative subpoena, without any need for consent, any notice, any opportunity to say, hold on a minute, I don't think I have to give you this under this subpoena. There's no pre-compliance review, opportunity to protest, need for consent, none of that. The issuance of this administrative subpoena authorizes the search. Is that your position? Our position is that the Texas Medical Board has an administrative regime in place that allows them to conduct inspections of medical facilities, which we assert are closely regulated businesses in Texas. The point of qualified immunity in this case is that there is no case finding that the medical industry in the state of Texas is something other than a closely regulated business. That point is not in dispute. And because there is no clearly established law indicating that the medical industry in Texas is something other than a closely regulated business, it is our position that — Well, you'll agree with me that this closely regulated business argument, there's only about four industries that have been determined under case law to be closely regulated businesses. Isn't that right? I believe this Court's found more than that, Your Honor. For instance, I would point to Daramus v. City of Alexandria. You don't even have to point to the cases. Just tell me which industries they found are closely regulated. Pawn brokering, deer breeding, the liquor industry, the pharmaceutical industry, massage parlors. These are things that have all been found by the Fifth Circuit to be closely regulated businesses. That's four. Keep going. I said four. The doctor's offices are not on it. That's correct, Your Honor, but there's no case that finds that they aren't. In fact, though, there are cases that say they're not. There are cases that discuss that doctors are clearly not. They don't analyze the issue, but they assume that everybody knows they're not. Well, actually, Your Honor, I think this Court's decision in Beck v. Texas State Board of Dental Examiners at 204-Fed3-629, the 2000 case out of this court, upheld qualified immunity for a person who did very much what Mary Chapman did, which was to deliver a standard subpoena to a dental office, along with state law enforcement authorities who were going in to collect records. And it's our position that this court, if it were to find that the medical industry, we don't think you need to reach the industry or reach the question of whether it's closely regulated, but the Beck v. Texas State Board case sets out that a medical practice like a dental office is something that is closely regulated and that an investigator would be entitled to qualified immunity if they are enforcing an administrative subpoena. A medical practice, a dental office, and it also involved state law enforcement doing that search. That's not that they were the ones driving the search. Well, they were also in there with the dental board examiner's office, and our position is that that case clearly sets out that there's a difference of opinion about whether medical offices like dental offices, which also deal with opioids and prescription and prescribing like the case here. But arguably, even if they are closely regulated, you can't just go snatch things that are not even pursuant. Well, not even arguably. You can't snatch things that are not pursuant to the administrative subpoena. And it's an allegation in this that we have to take as true that they're not responsive to the administrative subpoena, right? Well, I don't know that it doesn't say in the pleadings what the administrative subpoena covered. I understand that Counselor Verdun of Petropia is now making representations to the court about what the subpoena said. Well, surely you know what it said. It allowed for the inspection of documents. Related to two patients? It wasn't limited to two patients. Where is it? It's not in the record in this case. We could point to the record. I don't agree. The factual record was not developed in this case because Judge Ellison granted qualified immunity on the legal question. So there didn't need to be any further fulsome factual development because of the legal question that was presented to the court. While I understand that may be frustrating for this panel, that's also a reason why this case isn't really ripe for analysis on the Berger question, on the closely regulated business question, or on any of these issues because none of it's really been briefed before this court. Maybe we need to send it back so it can get developed. Well, Your Honor, I mean, the issue with qualified immunity is this is a purely legal question in front of this court. The district court did not find a fact question based on the pleadings that were presented to it. That's not an erroneous ruling. The record that was presented to Judge Ellison was extremely limited. That was by choice of Dr. Petropia. Dr. Petropia had not only filed his first complaint, but after we filed our motion to dismiss, filed a first amended complaint. He knew the arguments that— Well, we have Lee v. Seattle. We have Donovan v. Long Gun Star. I don't know that qualified immunity is appropriate. I'm not saying it's not. The difference in those cases is those all involved regimes that allowed for arrest for failure to comply. There's no allegation that Dr. Petropia was going to be arrested or threatened with arrest by anybody. There's no threat that he was going to be subjected to penalties for not providing documents on the day that Mary Chapman went in with an extender subpoena. And so those cases really aren't applicable here because they dealt with a different factual scenario. Isn't there an allegation that the assistant was threatened in that manner? I don't believe in the pleadings that there's any allegation that she was threatened. There's allegations in the pleadings that she did not agree that she was the custodian of record. But they wouldn't leave when she said you must leave. And they said she'd be arrested or something. Isn't that part of the— There's no allegation in the live pleading below that she was threatened with any kind of arrest. That's not in the record. Okay. I guess back to this closely regulated industry and the test you're talking about, the test that got applied in the Buns case. Berger. The— New York v. Berger. Are you back? I'm sorry. Okay. It was our case, three-judge panel, the Beck case. That test got applied. And it says that there has to be some substantial governmental interest that informs regulatory scheme pursuant to which the inspection is made. That's one. The warrantless inspections are necessary to further the regulatory scheme. Here we're talking about a license that had already been revoked, right? At the time, yes. So how is it further some regulatory scheme to go in there and get his records? You've already—the Texas Medical Board has issued a subpoena. They've already got his license. Is he appealing it and they need some additional records to fight him on appeal? I mean, what are they trying to—what do they need? How does that further their regulatory scheme? They've already regulated him and taken his license. This isn't—the reason behind the subpoena is not in the record, but I will share with this court the reason that they went out. If you look at page 85 of the record on appeal, that's the first page of the 100-page ALJ opinion. It gives a synopsis of what Dr. Katropia was accused of doing that led to the revocation of his license. A lot of it involved non-therapeutic prescribing of opioids. So it's my understanding from the Texas Medical Board that the reason behind the subpoena was that there was some concern that he was continuing to practice despite the revocation. So the point of the subpoena was to go out and get patient records to see if Dr. Katropia was still, in fact, prescribing opioids despite the fact that he had had his license revoked. Now, again, that's not in the record. Obviously, that doesn't help us in this case. But that's my understanding from the Medical Board as to why they went out. And so I don't think that there's any— What could the Medical Board do about it? Let's assume he was. What could they do? They'd already taken his license. They already got his license. What could they do? Well, if I had to dream up a scenario, Dr. Katropia could always reapply for his license. Dr. Katropia could challenge the revocation of his license. It's my understanding that Dr. Katropia was, in fact, in the process of challenging that revocation at the time. I would defer to Dr. Katropia's attorney on that piece because I'm not fully aware of all of the facts surrounding that. But the fact that— They were tagalongs. The DEA was with them. Well, that's not in the record either, Your Honor, but— It's in the transcript of Judge Ellison's hearing discussing that. The reason for the DEA is not in the record. The DEA was the tagalong in that case. Yes, but that's who wanted that part of the case. I would not know what the DEA wanted when they were going. I do know that the Texas Medical Board allowed DEA to go out of safety concerns. Ms. Chapman, who is one of the inspectors— Out of safety concerns? Well, Your Honor, when you're going to places that might be considered pill mills, there is a threat that there are people there who might be dangerous. And so because Ms. Chapman, despite the fact that she is technically a licensed peace officer under Texas state law, she is not allowed to carry a firearm, she has no arrest authority. And so having a DEA agent there who has the ability to protect her by having a gun or having backup to be called or having arrest authority— Good Lord, maybe he had enough to swear out a warrant and do a search. I mean, maybe the DEA is where this thing resides. I mean, I don't—you're in a difficult situation. Can you tell us which are the two pending cases in our circuits? You said you referred to them earlier. I did, Your Honor. I don't recall the full name of the cases. The first is Zada, Z-A-D-E-H. The second is Berry. That one's back to us again. Zada's already been here before, hasn't it? I think Zada's here on a different posture this time. Okay. Dr. Zada has several cases going in several courts throughout the state of Texas. Okay, and then what's the other one? Berry. Berry case. That's the case that Dr. Petropia's attorney was talking about with regard to Judge Rosenthal. That's been appealed to us now? That's correct. It's my understanding that both of those— By the board? I believe so, yes. And so those both would be in front of this court. It's our position that those would be better vehicles to address these issues because, as I understand it, they have a more fulsome record about the regulatory structure that TMB uses for administrative inspections at medical facilities. Is it your position that as long as the Texas Medical Board does not seek penalties against individuals, that it can go into people's offices and seize medical records? No, it's our position that the entire structure of a regulatory scheme that the TMB has in place provides an adequate substitute for a warrant when they are conducting inspections of medical facilities. And so it's not a question of whether they're going in and seizing records, but rather whether they're conducting an administrative inspection like regulatory authorities do in any other context. And in these other contexts, if it's like securities or something, people have a chance to litigate that beforehand. They go into court. Well, Your Honor, I mean, to tell the Texas Medical Board that they're not allowed to go and inspect and look at records unannounced would somewhat defeat the purpose of the administrative inspection. You call it an inspection, but it sure does sound like a search to me. Does an inspection get you from under the umbrella of the Fourth Amendment? Is that what we're talking about? If I say they were just looking at the records, they weren't really searching through records. I'm not trying to play with you. I understand, but, I mean, maybe they call it an inspection. And then she also copied them. So that's, I don't know what you call that, to avoid calling it a search. Well, we don't believe it would be a search in the context of an administrative inspection. And so it's not a question of trying to fit the square peg of what the TMB is doing into a round constitutional hole. We believe that the peg's round as well. The administrative inspection falls within the administrative search exception to the Fourth Amendment. And so it's not an issue of whether the Fourth Amendment applies. It's an issue of whether the medical industry in Texas has a lessened expectation of privacy that would make the administrative inspections that the TMB are conducting a reasonable exercise of state authority. And we believe it does. And because there are no cases on point that say this is not a closely regulated business or that our administrative inspection scheme is somehow unconstitutional, putting Ms. Chapman on fair notice that she is obliged not to do what she did, we believe that qualified immunity applies here. And we believe that this court should affirm the district court's ruling dismissing the claims against Ms. Chapman. Counsel, I know you believe that the brief does not adequately continue the claims against the board itself for the deck action, and we'll have to make that determination. But assuming arguendo that it is made out adequately in the brief, is the TMB continuing this practice in the ongoing matter such that it or is the deck action moot in any way? Well, we're not carrying out it against Dr. Petropa. But against other people? You can answer questions after the red line, but I appreciate your sensitivity to it. This is the administrative inspection process that the TMB has in place and we believe is constitutional. So this is what they're doing? We believe our administrative inspection process is constitutional. On an ongoing matter, yes. Yes, Your Honor. Okay. Thank you. Thank you. Thank you. Doctor, I'm sorry. Judge Rosenthal's order states the board is not authorized to physically search or inspect the doctor's office. All they can do is show up with an administrative subpoena, ask for the records, the records are not produced, go and ask for a pre-compliance hearing with either a magistrate or a mutual decision maker. But you're not bringing a facial challenge against the statute or the regulations under which they operate, are you? No. You're not doing that, are you? No, Your Honor, because Judge Rosenthal says that under the Texas Occupational Code, they can't do that. So counsel's representation that they can do that is incorrect. They cannot search a doctor's office. They do not have authority to do that. They can't inspect a doctor's office. They don't have the authority to do that. Now, the people who are doing it are these petty government officials, these investigators who have essentially gone wild in Texas. Those are the people doing that. Well, I don't know that that's a fair description. I don't know that they're petty. Gone wild. Gone wild. Maybe not. I use the petty because it's an old language from the, when they were doing the, back in 1791, that's the language they were using. Well, we've moved on from 1791, I guess. Yes, right. Do you have anything further, counsel? No, Your Honor. Thank you. We have your argument then. Thank you.